UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

WESTERN DIVISION

| | | |
|---|---|---|
| RHONDA OTIKER, | ) | CIV. 06-5077-KES |
| | ) | |
| Plaintiff, | ) | |
| | ) | ORDER REVERSING |
| vs. | ) | AND REMANDING |
| | ) | COMMISSIONER'S |
| MICHAEL J. ASTRUE, Commissioner of Social Security, | ) | DECISION |
| | ) | |
| Defendant. | ) | |

Plaintiff, Rhonda Otiker, moves for reversal of the Commissioner of Social Security's ("Commissioner") decision denying her application for disability insurance benefits under Title II of the Social Security Act. Defendant opposes the motion. The court reverses and remands the Commissioner's decision denying benefits for the reasons stated below.

**PROCEDURAL BACKGROUND**

Otiker filed an application for benefits alleging a disability onset date of October 26, 2000. AR 154.[1] The application was denied initially and again upon reconsideration. AR 124, 104-05. Otiker then requested a hearing before an Administrative Law Judge (ALJ). After the hearing, ALJ James W. Olson issued a decision (first decision) in which the ALJ concluded that Otiker

---

[1] All citation to "AR" refer to the appropriate page of the administrative record found at Docket 9.

was not disabled during the period from October 26, 2000, to March 19, 2003, but was disabled for the period beginning March 19, 2003. AR 116-17. He found that Otiker was entitled, therefore, to disability benefits beginning on March 19, 2003. Id. Otiker appealed, and the Appeals Council vacated the ALJ's decision and remanded for further consideration. AR 149-50. Following a supplemental hearing, the ALJ issued a second decision (second decision) and concluded that Otiker was not disabled at any point in time, and thus, was not entitled to benefits. AR 19-32. Otiker again appealed this decision, but the Appeals Council denied the request for review. AR 11. The ALJ's second decision is thus the "final decision" under 42 U.S.C. § 405(g).

## FACTUAL BACKGROUND[2]

Otiker is an obese, 50-year-old woman. She graduated from high school and completed one year of college. AR 227. Her past relevant work is as a certified nursing assistant (CNA), a store clerk, a salad preparation worker, an assistant store manager, a bookkeeper, a cook, a housekeeper, a meat wrapper, and a bar maid. AR 230-32.

On October 26, 2000 (Otiker's alleged onset date), Otiker was working as a CNA when she injured her right knee. AR 312. She was seen by

---

[2] The court limits its discussion of the facts to those pertinent to this appeal. The court specifically refrains from discussing the facts related to Otiker's mental limitations because Otiker does not contest the ALJ's finding that Otiker's mental limitations do not qualify as "severe impairments" under the regulations.

Timothy J. Gill, M.D. AR 312. After x-rays and an MRI, Dr. Gill diagnosed Otiker with a torn anterior cruciate ligament (ACL) and degenerative arthritis of her right knee. Dr. Gill initially tried to treat the knee injury with immobilization and physical therapy. AR 311-12. Because conservative treatment was ineffective, Otiker underwent ACL reconstruction surgery on January 29, 2001. AR 295.

Following the surgery, Otiker continued to experience pain in her right knee. AR 287-91. On June 6, 2001, she was seen again by Dr. Gill. AR 286. Otiker reported that she was still experiencing a lot of pain despite being five months post surgery. Dr. Gill suggested that Otiker's pain may be caused by "a mild sympathetic dystrophy." Id. Dr. Gill referred Otiker to a pain specialist.

Starting on June 22, 2001, and continuing through January 10, 2003, Otiker was treated by Steven Frost, M.D., a pain management specialist. AR 445-82, 519-41. Dr. Frost concluded that Otiker was suffering from right knee pain caused by causalgia or RSD,[3] and a mixed pain syndrome known as complex regional pain syndrome I and II. AR 481. At a deposition taken for Otiker's worker's compensation matter, Dr. Frost described Otiker's condition:

> When a person gets an injury, whether it's related to a trauma or due to surgery around a nerve, the sympathetic nerves

---

[3] RSD is another name for complex regional pain syndrome I and causalgia is another name for complex regional pain syndrome II. AR 546.

>will start to overreact and they actually will bud and form new nerves . . . [and] they start crossing over to the normal pain nerves and start carrying sensations of pain to the brain.
>
>Not one finding is constant for each patient. You can get increased sensitivity in one patient to touch, another patient can just have a limited range of motion to the affected area because, quote, unquote, they just can't move it, it's swollen.
>
>Classic findings are swelling, color change, temperature change, severe sensitivity to touch, which causes severe pain. That's a classic, full-blown reflex sympathetic dystrophy, and, again, that's just were the sympathetic nerves overreact.

AR 544. Dr. Frost testified that the following objective evidence supports his diagnosis: (1) x-rays and a bone scan indicating degenerative joint disease in Otiker's knee; (2) increased sensitivity to touch during a physical examination; (3) mild swelling and color change observed during examination; and (4) increased pain caused by palpitation. AR 545. Dr. Frost further testified that Otiker needed to sit and elevate her leg three to four times per day for between 15 minutes and one hour at a time; that he does not think Otiker is malingering; that Otiker's condition is permanent; and that Otiker suffers from constant, severe, and debilitating pain. AR 545-56.

On November 19, 2001, Otiker was examined by Wayne J. Anderson, M.D., for the purpose of performing an independent medical evaluation. AR 369-87. Dr. Anderson diagnosed Otiker as suffering from chronic low back pain, diabetes mellitus, obesity, and "status post right ACL repair with causalgia and RSD as diagnosed by Dr. Frost." AR 386. Dr. Anderson stated

that he found no objective findings of RSD during his examination.  Id.
Dr. Anderson indicated that Otiker's complaints of pain during the examination would prevent her from working, and that "she has a multitude of medical problems, which contribute to her disability."  AR 386.

On October 18, 2001, Otiker filled out a personal pain questionnaire. AR 237-45.  Otiker described suffering from continual burning pain of the right knee and lower leg. AR 237.  She indicated that activity, movement, and fabric rubbing against her knee makes her pain worse, while inactivity makes her pain better.  AR 237.  Otiker indicated that the pain has reduced her ability to go shopping and to do the vacuuming and mopping.  AR 238.  Otiker stated that she does most of the cleaning, washes dishes, washes laundry, and sweeps.  Id.  Otiker also indicated that her pain limits her to sedentary work.  AR 240.

On November 27, 2001, at the request of a worker's compensation insurer, Otiker underwent an orthopedic evaluation by Paul E. Ruttle, M.D. After examining Otiker and reviewing her medical records, Dr. Ruttle diagnosed Otiker with "[c]hronic regional pain syndrome, type 2" of the right knee.  AR 433. In a deposition for the worker's compensation matter, Dr. Ruttle described Otiker's condition:

> Complex regional pain syndrome is a complex and controversial area of medicine.  It refers to pain that develops usually in an extremity, either after a noxious stimuli, contusion, all sorts of

5

> things, fractures, anything like that, with pain that follows a nonanatomic patter of pain distribution in the extremity.
>
> Pain somewhat out of proportion to – many times out of proportion to the degree of trauma. Pain that is produced or can be produced with very mild stimuli; for example, simply touching the area of the – that is painful with very light touching, even blowing on it, clothes touching it, attempting to move the limb or the joint affected by the pain.

AR 420. Dr. Ruttle testified that this diagnosis was supported by color and temperature change observed during a physical examination; by pain in Otiker's leg out of proportion to the degree of palpitation; by evidence of extreme sensitivity; and by Otiker's complaints of severe and burning pain. Id. Dr. Ruttle also testified that Otiker should be able to work in a sitting position so long as she can elevate her leg occasionally depending upon her pain level. AR 421.

On December 17, 2001, Jesse Easton, M.D., a state agency physician, reviewed Otiker's medical records and completed a physical residual capacity assessment. AR 388-95. Dr. Easton opined that Otiker could lift up to 20 pounds occasionally and 10 pounds frequently; stand at least 2 hours in an 8-hour work day for 10-20 minutes at a time; and sit about 6 hours in an 8-hour work day so long as she can elevate her leg. AR 389. Dr. Easton also opined that Otiker's legs limited her ability to push or pull; that she could climb, balance, stoop, kneel, and crawl occasionally; and that she should

avoid even moderate exposure to extreme hot or cold because it makes her symptoms worse. AR 390-92.

During a follow-up visit on October 24, 2002, Dr. Frost indicated that Otiker was still experiencing pain. AR 527. Dr. Frost also stated that cold weather made Otiker's pain worse. Dr. Frost also indicated in a letter dated May 10, 2002, that Otiker's statement, that the length of time she needs to elevate her leg depends on whether she is having "a good or bad day," is consistent with Otiker's condition and the objective findings. AR 446.

On April 26, 2002, F.R. Entwistle, M.D., a state physician, reviewed Otiker's medical records and completed a physical residual capacity assessment. AR 437-44. Dr. Entwistle opined that Otiker can lift 20 pounds occasionally and 10 pounds frequently; stand at least 2 hours in an 8-hour day; and sit about 6 hours in an 8-hour day. Ar 438. Dr. Entwistle further opined that Otiker had no limitations in her ability to push or pull. AR 439. Dr. Entwistle opined that Otiker should never climb a ladder, rope or scaffold, that she can occasionally stoop, kneel, crouch, crawl, and climb ramps or stairs, and that she can frequently balance. AR 439. Dr. Entwistle also opined that Otiker had unlimited ability to work in environments of extreme cold or heat. AR 441.

Otiker has continued to obtain treatment since 2002 for her knee pain. Following a visit to Terry M. Graber, M.D., for treatment on April 12, 2004,

Dr. Graber opined that Otiker's chronic right knee pain "is going to be a disabling phenomena for her and, at this point, it is probably going to be a long term management issue." AR 674.

On January 30, 2003, Otiker appeared and testified at a hearing before the ALJ. Otiker testified that she was currently working as a medical transcriptionist from her home. AR 50. Otiker was only allowed to transcribe 250 lines per day, five days per week. AR 53. Otiker testified that on an average day she wakes up and starts typing somewhere between 8 and 9 a.m. AR 54. She would type for between one-and-one-half and two hours before taking a ten to fifteen minute break to elevate her leg. Id. After the break, she continues typing until her husband comes home for lunch. AR 55. Otiker then takes a break and elevates her leg for half an hour. Id. After lunch, Otiker finishes her typing, which takes about one to one-and-one-half hours. AR 56. She then takes a rest and prepares supper. Id. After supper, she does the dishes and relaxes. Id.

Otiker also testified that she has "bad days" when her pain is worse. AR 57. She indicated that cold weather aggravates the pain in her knee and prevents her from performing any work at all. AR 58. Otiker estimated that between November and March, she has approximately three to four weeks worth (in total rather than consecutive) of bad days during which her pain prevents her from working. AR 59. Otiker also testified that heat and

humidity can make her pain worse, and that she has approximately one week worth of bad days in the summer.  AR 59-60.

William Tysdal, a vocational expert, testified at the first hearing as well.  AR 66.  Mr. Tysdal testified that the maximum number of absences an employer would tolerate from a worker of Otiker's skill level is two absences per month.  AR 71.

Another hearing was held before the ALJ on October 25, 2007.  AR 83.  Otiker testified that she lost her medical transcription job because her pain reduced her production so much that her employer refused to renew her contract.  AR 93.  After the medical transcription job, Otiker worked full time as a flagger for a construction company.  AR 94.  She was allowed to sit in a chair or her car while working.  AR 64.  Otiker testified that after about six weeks she was laid off because her employer thought the job was too stressful for her.  AR 95.  She later started working one four-to-six hour day per week doing secretarial work for her church.  Id.  Otiker also testified that there are cold days in the winter when the pain prevents her from doing anything.  AR 98.

## ALJ'S DECISION

On April 22, 2006, the ALJ issued the second decision and denied Otiker's application for benefits.  The ALJ applied the familiar five-step

evaluation process.[4] At step one, the ALJ concluded that Otiker had not engaged in substantial gainful activity since her alleged onset date of October 26, 2000. AR 31. At step two, the ALJ determined that Otiker suffered from the following severe impairments: a history of right anterior cruciate ligament reconstruction, chondromalacia-right knee, and obesity. At step three, the ALJ concluded that these impairments were not of listing severity. The ALJ thus proceeded to step four and determined Otiker's residual functional capacity (RFC). The ALJ found that Otiker's RFC enabled her to perform sedentary work, to lift and carry 5 pounds frequently and 10 pounds occasionally, to sit at least 6 hours in an 8-hour day, and to stand or walk for less than 2 hours in an 8-hour day. AR 32. The ALJ also found that Otiker's RFC required her to elevate her leg during 15-minute breaks. Id. The ALJ determined that Otiker's RFC prevented her from performing her past relevant work. The ALJ thus proceeded to step five and concluded that Otiker

---

[4] The five-step sequential evaluation process as outlined by the Eighth Circuit is: (1) whether the claimant is presently engaged in a "substantial gainful activity;" (2) whether the claimant has a severe impairment—one that significantly limits the claimant's physical or mental ability to perform basic work activities; (3) whether the claimant has an impairment that meets or equals a presumptively disabling impairment listed in the regulations (if so, the claimant is disabled without regard to age, education, and work experience); (4) whether the claimant has the residual functional capacity to perform his or her past relevant work; and (5) if the claimant cannot perform the past work, the burden shifts to the Commissioner to prove that there are other jobs in the national economy that the claimant can perform. Baker v. Apfel, 159 F.3d 1140, 1143-44 (8th Cir. 1998).

could perform a significant range of sedentary work, including work as a telephone solicitor, an order clerk, and a call-out operator. As a result, the ALJ held that Otiker was not entitled to benefits.

## STANDARD OF REVIEW

The decision of the ALJ must be upheld if it is supported by substantial evidence in the record as a whole. See 42 U.S.C. § 405(g); Choate v. Barnhart, 457 F.3d 865, 869 (8th Cir. 2006). Substantial evidence is less than a preponderance but enough evidence that a reasonable mind might find it adequate to support the conclusion. See Baker v. Barnhart, 457 F.3d 882, 892 (8th Cir. 2006); see also McKinney v. Apfel, 228 F.3d 860, 863 (8th Cir. 2000); Richardson v. Perales, 402 U.S. 389, 401, 91 S. Ct. 1420, 1427, 28 L. Ed. 2d 842 (1971). Review by this court extends beyond a limited search for the existence of evidence supporting the Commissioner's decision to include giving consideration to evidence in the record which fairly detracts from the decision. See Maresh v. Barnhart, 438 F.3d 897, 898 (8th Cir. 2006); Craig v. Apfel, 212 F.3d 433, 435 (8th Cir. 2000).

The court's role under section 405(g) is to determine whether there is substantial evidence in the record as a whole to support the decision of the Commissioner and not to re-weigh the evidence. See Vester v. Barnhart, 416 F.3d 886, 889 (8th Cir. 2005); Guilliams v. Barnhart, 393 F.3d 798, 801 (8th Cir. 2005). Furthermore, a reviewing court may not reverse the

11

Commissioner's decision " 'merely because substantial evidence would have supported an opposite decision.' " Reed v. Barnhart, 399 F.3d 917, 920 (8th Cir. 2005) (quoting Shannon v. Chater, 54 F.3d 484, 486 (8th Cir. 1995)); see also Eichelberger v. Barnhart, 390 F.3d 584, 589 (8th Cir. 2004).  The court must review the Commissioner's decision to determine if an error of law has been committed.  See Olson ex rel. Estate of Olson v. Apfel, 170 F.3d 820, 822 (8th Cir. 1999); Smith v. Sullivan, 982 F.2d 308, 311 (8th Cir. 1992).  Issues of law are reviewed de novo with deference given to the Commissioner's construction of the Social Security Act.  See Smith, 982 F.2d at 311; see also Olson ex rel. Estate of Olson, 170 F.3d at 824.  If the ALJ's decision is supported by substantial evidence, then this court cannot reverse the decision of the ALJ even if the court would have decided it differently.  See Baker, 457 F.3d at 892.

## DISCUSSION

Otiker argues that the ALJ committed reversible error by concluding that Otiker's subjective complaints of pain were not fully credible.  She observes that the ALJ credited "the vast majority of [her] subjective complaints regarding her knee." (Docket 11, at 11).  She contends that the ALJ erred, however, in discounting her testimony that she suffers from weather-related "bad days" during which she can perform no work.

As a threshold matter, the court must determine whether the ALJ discounted Otiker's subjective complaints of "bad days." Although the ALJ's findings indicate that "[t]he undersigned finds that claimant's allegations regarding her limitations are not totally credible for the reasons set forth in the body of the decision," AR 31, the body of the ALJ's decision does not explicitly indicate which of Otiker's allegations are not deemed credible. The ALJ's decision, however, does implicitly reject Otiker's subjective complaints of "bad days." The ALJ's decision acknowledges:

> [Otiker] testified that the pain is worse during the winter months. She typically has 3-4 weeks when the pain is so bad that she cannot work. Although heat and humidity also bother her, she generally only has 1 week during the summer when she cannot work. On bad days, the claimant spends a lot of time in a hot water bath and uses a cane.

AR 29. The VE's testimony indicates that employers in the competitive setting would not accept this large number of unanticipated absences. AR 69-71. As a result, if Otiker experiences between three to four weeks of bad days per winter, then the high number of absences would prevent her from working. The ALJ found, however, that Otiker's RFC did not prevent her from performing "a significant range of sedentary work." AR 32. By finding that Otiker can work, the ALJ implicitly rejected Otiker's testimony that she suffers from "bad days" that prevent her from working. The court thus must determine whether the ALJ erred in discounting Otiker's subjective complaints.

An ALJ must determine the credibility of a claimant's subjective complaints of pain according to the analytical framework developed in Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984). In determining the proper weight attributable to a claimant's subjective complaints, the ALJ must consider several factors: "(1) the claimant's daily activities; (2) the duration, frequency and intensity of pain; (3) the dosage, effectiveness and side effects of medication; (4) precipitating and aggravating factors; and (5) functional restrictions." Strongson v. Barnhart, 361 F.3d 1066, 1072 (8th Cir. 2004); see also Polaski, 739 F.3d at 1322. "Other relevant factors include the claimant's relevant work history and the absence of objective medical evidence to support the complaints." Haggard v. Apfel, 175 F.3d 591, 594 (8th Cir. 1999). The ALJ does not have to explicitly discuss each factor so long as the ALJ "acknowledges and considers those factors before discounting a claimant's subjective complaints." Goff v. Barnhart, 421 F.3d 785, 791 (8th Cir. 2005). The ALJ "may discount a claimant's subjective complaints of pain only if there are inconsistencies in the record as a whole." Brown v. Chater, 87 F.3d 963, 965 (8th Cir. 1996). The ALJ is expected, however, "to 'detail the reasons for discrediting the testimony and set forth the inconsistencies found.'" Gulliams v. Barnhart, 393 F.3d 798, 802 (8th Cir. 2005) (quoting Lewis v. Barnhart, 353 F.3d 642, 647 (8th Cir. 2003)).

Otiker argues that the ALJ erred by failing to provide specific reasons for discrediting her testimony that she has approximately three to four weeks worth of "bad days" in the winter and approximately one week worth of "bad days" in the summer during which she can perform no work. The ALJ did explicitly acknowledge the <u>Polaski</u> factors and made an express credibility finding: "The undersigned finds [Otiker's] allegations regarding her limitations are not totally credible for the reasons set forth in the body of the decision." AR 27, 31. The ALJ did not state, however, which of Otiker's subjective complaints were incredible. Nor did the ALJ provide any discussion or analysis explaining how the <u>Polaski</u> factors support rejection of some of Otiker's subjective complaints but not others. In other words, despite recognizing the appropriate factor analysis, the ALJ failed to actually <u>apply</u> the <u>Polaski</u> factors in this case and explain his reasoning for discrediting Otiker's tetimony. This in turn prevents the court from reviewing the ALJ's credibility determination because the court cannot determine the ALJ's reasoning for discrediting Otiker's testimony.

Relying on <u>Strongson v. Barnhart</u>, 361 F.3d 1066, 1072 (8th Cir. 2004), defendant argues that the ALJ's failure to properly apply the <u>Polaski</u> analysis is a mere deficiency in opinion writing that does not require reversal. In <u>Strongson</u>, the claimant argued that the ALJ erred in discounting her subjective complaints because the ALJ did not explicitly discuss each of the

Polaski factors.  See id.  The Court of Appeals for the Eighth Circuit disagreed and stated "[i]t is sufficient if [the ALJ] acknowledges and considers [the Polaski] factors before discounting a claimant's subjective complaints."  The court recognized that the ALJ must, however, "give reasons for discrediting the claimant."  Id.  The Eighth Circuit also indicated that courts should not reverse "an administrative finding based upon an 'arguable deficiency in opinion-writing technique' when it is unlikely it affected the outcome."  Id. (quoting Brown v. Chater, 87 F.3d 963, 966 (8th Cir. 2004)).

Defendant argues that the court should disregard the ALJ's deficient opinion writing here.  Specifically, the defendant argues that the ALJ's error had no effect on the outcome of the case because Otiker's testimony regarding "bad days" is inconsistent with the record as a whole.  The court, however, finds that the ALJ's error—the failure to properly apply the Polaski analysis—may well have affected the outcome of this case.

This is not a case where the record as a whole overwhelmingly refutes the Otiker's testimony regarding her "bad days."  Rather, the record contains considerable evidence corroborating Otiker's testimony that weather, and in particular cold weather, makes Otiker's pain worse.  For instance, Dr. Frost, a pain specialist who treated Otiker, indicated that cold weather makes Otiker's pain worse. AR 527.  Dr. Frost also indicated that Otiker's allegations that she has "good days" and "bad days" is consistent with her condition and the

16

objective medical findings. AR 446. Finally, Dr. Easton, a consulting physician, reviewed Otiker's medical records and indicated that she should avoid even moderate exposure to extreme hot or cold because this makes her symptoms worse. AR 392. The court, however, is not indicating that the only proper decision was to credit Otiker's testimony. Instead, the foregoing evidence simply establishes that the court cannot determine whether the ALJ would have credited Otiker's testimony if the ALJ had actually employed the proper Polaski analysis. If the ALJ would have credited Otiker's testimony about the number of "bad days" she experiences, then based on the VE's testimony, the ALJ would have had to conclude that Otiker cannot work and she would be entitled to benefits. The ALJ's credibility determination is thus critical to the outcome of the case, and the court cannot overlook the deficiencies in the ALJ's opinion writing.

## CONCLUSION

The Eighth Circuit has provided an explicit framework, known as the Polaski factors, for evaluating a claimant's subjective complaints. If an ALJ applies this framework and provides good reasons for discounting the credibility attributable to a claimant's subjective complaints, the ALJ's credibility determination is entitled to deference. See Cox v. Barnhart, 471 F.3d 902, 907 (8th Cir. 2006). When, however, the ALJ fails to apply the Polaski framework and provides no reasons for rejecting a claimant's

17

subjective complaints, the ALJ effectively prevents the court from reviewing the ALJ's credibility determination. In this instance, the proper recourse is to remand the case to the Commissioner and order the Commissioner to engage in the proper analysis.

Based on the foregoing, it is hereby

ORDERED that this case is remanded to the Commissioner in accordance with 42 U.S.C. § 405(g).

Dated July 5, 2007.

>BY THE COURT:
>
>/s/ *Karen E. Schreier*
>KAREN E. SCHREIER
>CHIEF JUDGE